**BOWLING GREEN–WARREN COUNTY AIRPORT BOARD, Petitioner,**

v.

**CIVIL AERONAUTICS BOARD, Respondent.**

**No. 72–1870.**

United States Court of Appeals, Sixth Circuit.

Argued April 12, 1973.

Decided June 1, 1973.

James David Bryant, Bowling Green, Ky., for petitioner; Allender, Simmons & Robertson, Bowling Green, Ky., on brief.

O. D. Ozment and Calvin Davison, Washington, D. C., for respondent; R. Tenney Johnson, Warren L. Sharfman, Robert L. Toomey, Rozann M. Skozen, Civil Aeronautics Bd., Thomas E. Kauper, Asst. Atty. Gen., Howard E. Shapiro, Dept. of Justice, Washington, D. C., on brief.

Calvin Davison, Reavis, Pogue, Neal & Rose, Washington, D. C., for intervenor.

Before PHILLIPS, Chief Judge, and CELEBREZZE and MILLER, Circuit Judges.

CELEBREZZE, Circuit Judge.

This is a petition for review of the decision and final order No. 72–7–25, rendered by the Civil Aeronautics Board (hereinafter the Board) on July 7, 1972. By this order the Board granted the ap-

plication of Eastern Air Lines, Inc., for amendment of its certificate of public convenience and necessity for Route 10 so as to delete the point Bowling Green, Kentucky, from that route.

The following facts, as adopted by the Board, appear in the initial decision of the examiner. Bowling Green is the county seat of Warren County, Kentucky, and the trade center for several counties in south-central Kentucky. In recent years Bowling Green and Warren County have experienced a trend of industrialization and relatively rapid growth. Thus Bowling Green's population has increased from about 18,000 in 1950 to about 38,000 in 1970, and the County's population increased from about 43,000 to about 55,000 during the same period.

Bowling Green is located approximately 60 miles north of Nashville, Tennessee, and approximately 100 miles south of Louisville, Kentucky, both of which cities are classified by the Federal Aviation Administration as medium air traffic hubs. From the Nashville airport, five trunklines and four local service air carriers provide single-plane service to over 65 cities throughout the United States. From the Louisville airport, four trunklines and three local service air carriers provide single-plane service to over 70 cities across the county. Louisville, Bowling Green, and Nashville are linked by Interstate Highway 65, a major north-south highway, as well as a major bus line providing frequent service between these points and beyond.

Since its certificate was amended in 1947 so as to add Bowling Green as a point on its Nashville-Louisville segments of Route 10, Eastern provided continued daily service to Bowling Green up to September 1969.[1] In fiscal year 1969, the number of origin and destination passengers for Eastern at Bowling Green had reached 11,852 per year or over 32 per day on its two daily schedules

(southbound in the mid-morning and northbound in the late afternoon), and traffic had increased at a rate of about 2,000 passengers per year.

On May 1, 1969, Eastern filed an application requesting suspension of its service at Bowling Green and approval of an agreement between Eastern and Air South, Inc., whereunder Air South would be employed by Eastern as an independent contractor to perform replacement service to Bowling Green. Air South was to provide three daily roundtrips between Bowling Green and Louisville and two daily roundtrips between Bowling Green and Nashville, and bear its own expenses subject to Eastern's agreement to underwrite Air South in amounts of no more than $50,000 the first year, $10,000 the second year, and $5,000 the third year. In support of its application, Eastern cited its competition from numerous strong trunklines which are able to devote their full attention to dense and/or long-haul routes upon which Eastern is dependent for economic survival. Eastern noted that it would save $300,000 annually from suspension at Bowling Green and that Bowling Green would benefit from the more frequent service to Nashville and Louisville under the replacement service.

In August 1969, the Board approved Eastern's application for temporary suspension at Bowling Green and the agreement for replacement service by Air South. The Board's approval was made subject to the condition that the suspension granted to Eastern would immediately terminate if Air South should cease to satisfactorily provide the specified replacement service.

Air South provided reliable service from September 2, 1969 through March 31, 1970, when it terminated its replacement service due to a lack of financial resources and support. Notwithstanding Air South's morning, afternoon, and

1. Claiming an insufficient number of passengers at Bowling Green to support the two daily roundtrip flights it was then providing to Nashville and Louisville, in 1961 Eastern applied for suspension and

deletion of Bowling Green and replacement of its Nashville-Bowling Green-Louisville service by Ozark Air Lines, Inc. The Board denied this application in a decision rendered in 1964.

evening service from Bowling Green to Louisville and Nashville, the number of origin and destination passengers at Bowling Green dropped to an average of 21.9 per day during this seven month period—a decline of about one-third from the traffic Eastern had carried just prior to its replacement by Air South.

Faced with the legal obligation of providing air service to Bowling Green when Air South terminated its replacement service, Eastern on March 30, 1970, applied to the Board for continuation of its temporary suspension at Bowling Green and for approval of a one-year agreement between Eastern and Northern Airlines, Inc., which was then providing scheduled air service between Louisville, Bowling Green, and Nashville. Under the agreement Eastern would underwrite Northern in the amounts of $8,000 per month for the first three months of operation and no more than $4,000 per month thereafter for the latter's replacement service at Bowling Green.

Pending the Board's consideration of the above application, Northern's service was admittedly unreliable and unsatisfactory, and Northern in fact terminated service at Bowling Green on or about May 8, 1970. Bowling Green was thus without reliable and satisfactory air service from April 1, 1970, until May 25, 1970, and with no service at all during the last 17 days of this period.

On May 25, 1970, Eastern entered into a third contractual agreement for replacement service to Bowling Green, this time with Wright Air Lines, Inc. Whereas Air South and Northern in essence had been employed as independent contractors, retaining all revenues and bearing all expenses subject to underwriting payments by Eastern, Wright was essentially employed to provide substitute air service on a cost-plus-10 percent basis, subject to an initial ceiling of $28,000 per month. Under the agreement, Wright was to provide Bowling Green with at least three daily round-trips to Louisville and at least two daily roundtrips to Nashville.

On September 24, 1970, the Board approved Eastern's application for continued temporary suspension at Bowling Green, subject to Wright's performance of the specified replacement service, and the agreement between Eastern and Wright for such replacement service. In so approving Eastern's application, the Board acknowledged that replacement service at Bowling Green had not been satisfactory. The Board was nonetheless of the belief that Wright's replacement service, sponsored and sustained by Eastern, would be superior to prior replacement service and superior to the service which would be provided directly by Eastern were the suspension denied.

On December 31, 1970, Eastern filed the present application for deletion of Bowling Green from its certificate for Route 10.

In his initial decision rendered after a public hearing, Examiner Sornson apparently recognized that there is no reasonable prospect that reinstitution of direct service at Bowling Green by Eastern would be economically feasible. The Examiner nonetheless concluded that Bowling Green should not be deleted from Eastern's certificate, but rather that Eastern should continue to be responsible for the community's air service needs through support of air taxi replacement service. The Examiner found Eastern's request for total relief by way of deletion of Bowling Green to be unwarranted in that "Eastern (had) not shown that a substitute service arrangement at Bowling Green cannot be successful. . . ." In support of this conclusion, Examiner Sornson cited what he found to be inadequate subsidies paid by Eastern to Air South and Wright and Eastern's failure to effectively promote and advertise the replacement service.

Reviewing the decision of the Examiner, the Board rejected his finding that Eastern had failed to show that a sub-

stitute service arrangement cannot be successful at Bowling Green and his conclusion that Eastern should remain responsible for the community's air service needs through support of air taxi replacement service. Instead, the Board concluded from the evidence that

"continued air taxi operations have only a limited chance of eventual success and that there are no unusual or extenuating circumstances which would warrant support of the magnitude which would be required to continue such operations."

In support of its conclusion, the Board reviewed the decline in the number of passengers experienced by both Air South and Wright and the resulting operating losses suffered by these replacement carriers, notwithstanding the substantial subsidies paid by Eastern. Thus Air South, with its fully satisfactory schedules and performance, was able to generate only 22 daily origin and destination passengers, resulting in a loss of over $127,000 during its seven months of operation. And during its first year of operation, Wright experienced traffic of under 20 daily origin and destination passengers, resulting in a loss of $242,000 or $35 per passenger. The Board also relied on the evidence that after approval—without civic objection —of reduced service by Wright in May 1971 to stem continuing losses, traffic dropped to about 12 passengers per day.

The Board further rejected the Examiner's finding that the decline in passenger traffic is attributable to Eastern's failure to promote and assist the substitute service and Eastern's inadequate subsidies. In addition to providing support services for both Air South and Wright, Eastern spent about $3,500 in the year ended May 1971 advertising and promoting Wright's substitute service. Eastern paid Air South $50,000 in cash subsidy for the latter's seven months of operation and paid Wright almost $300,-000 for the first year of its replacement service.

The Board therefore concluded that the public convenience and necessity require the amendment of Eastern's certificate for Route 10 so as to delete Eastern's authority to serve Bowling Green.

■■ Under our narrow scope of review as set forth in 49 U.S.C. § 1486(e), the Board's findings of fact are conclusive if supported by substantial evidence. Beyond this scope of judicial review, we must defer to the Board's expertise and discretion in weighing the many factors and policy considerations which enter into Board decisions respecting public convenience and necessity. See City of Pontiac v. C. A. B., 361 F.2d 810, 814–815 (6th Cir. 1966).

■ From the record before us we find that the Board's findings of fact are supported by substantial evidence. Relying upon the undisputed rates of traffic generation at Bowling Green between 1962 and 1969, the Board found that there is no reasonable prospect.that a reinstitution of direct service by Eastern could be profitable in the future. This finding—which also appears to be a conclusion of the Examiner—is supported by evidence that during its peak year of 1969 with 11,853 origin and destination passengers at Bowling Green, Eastern achieved load factors of only about 30 percent and suffered an operating loss of almost $300,000 (about $25 per Bowling Green passenger) on its Bowling Green-Nashville and Bowling Green-Louisville flights.

We also find substantial evidence on the record to support the Board's findings that continued replacement air taxi operations supported by Eastern have an extemely limited chance of success and that traffic response to these operations does not warrant their continuation. As reviewed above, the declining traffic under Air South's and Wright's operations, and the substantial operating losses suffered by these replacement carriers despite Eastern's subsidies fully support these findings by the Board.

We find no merit in Petitioner's argument that the Board's order must be set aside, because the Board failed to give sufficient weight to the several factors prescribed in 49 U.S.C. § 1302.[2] Petitioner asserts that the Board failed to adequately consider the future commercial needs of Bowling Green as well as the effects of its decision upon the Postal Service and the national defense.

With respect to Bowling Green's future commercial needs, its opinion discloses that the Board was fully aware of the factors favoring the maintenance of air service not only in Bowling Green but also in all smaller communities across the nation. On balance, however, the Board found that Bowling Green's future commercial needs and the community benefits from certified air service do not warrant continued requirements that Eastern—as a trunkline carrier—bear the responsibility and expense of the unsuccessful operations at the City. Finding no abuse of the Board's discretion, we are powerless to reweigh these factors which were before the Board. *See* City of Pontiac v. C. A. B., *supra*, 361 F.2d at 814–815; Outagamie County v. C. A. B., 355 F.2d 900, 906 (7th Cir. 1966).

Moreover, we find in the record no evidence respecting the effects of the Board's decision on the present and future needs of the Postal Service and the national defense. Even if such evidence

had been introduced, however, we do not believe that the Board is required in every case to make express findings on every factor set forth in Section 1302. *See* Outagamie County v. C. A. B., *supra*, 355 F.2d at 906.

The order of the Board is affirmed.

2. 49 U.S.C. Section 1302 provides as follows:

"In the exercise and performance of its powers and duties under this chapter, the Board shall consider the following, among other things, as being in the public interest, and in accordance with the public convenience and necessity:

(a) The encouragement and development of an air-transportation system properly adapted to the present and future needs of the foreign and domestic commerce of the United States, of the Postal Service, and of the national defense;

(b) The regulation of air transportation in such manner as to recognize and preserve the inherent advantages of, assure the highest degree of safety in, and foster sound economic conditions in, such transportation, and to improve the relations between, and coordinate transportation by, air carriers;

(c) The promotion of adequate, economical, and efficient service by air carriers at reasonable charges, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices;

(d) Competition to the extent necessary to assure the sound development of an air-transportation system properly adapted to the needs of the foreign and domestic commerce of the United States, of the Postal Service, and of the national defense;

(e) The promotion of safety in air commerce; and

(f) The promotion, encouragement, and development of civil aeronautics. Pub.L. 85–726, Title I, § 102, Aug. 23, 1958, 72 Stat. 740."